Filed 2/24/15  P. v. Craig CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060425 |
| v. | (Super.Ct.No. RIF71131) |
| STEVEN ERIC CRAIG, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Becky Dugan, Judge.  Affirmed.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael P. Pulos and Warren Williams, Deputy Attorneys General, for Plaintiff and Respondent.

1

In 1997, a jury convicted defendant and appellant Steven Eric Craig of making a threat against a public defender. (Former Pen. Code, § 76, subd. (a)[1]). The People alleged and proved that defendant had two strike priors, so he was sentenced to 25 years to life under the three strikes law as it existed at the time of sentencing. After the passage of the Three Strikes Reform Act of 2012, added by Proposition 36 (as approved by voters, Gen. Elec. (Nov. 6, 2012)) (the Reform Act), defendant petitioned the court for recall of his original sentence and resentencing. (§ 1170.126, subd. (b).) After finding defendant ineligible for the relief he sought, the trial court denied his request.

On appeal, defendant contends the trial court erred in finding him ineligible for resentencing on the ground that he had intended to commit great bodily injury during the commission of the current offense (§ 667, subd. (e)(2)(C)(iii)), which was mailing a threatening letter about his public defender to the district attorney (former § 76). Specifically, defendant argues that he could not have intended to commit great bodily injury during the threat because great bodily injury cannot be caused by the mailing of a letter. We disagree and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The following summary is taken from our partially published opinion, *People v. Craig* (1998) 65 Cal.App.4th 1082 (*Craig*) (Fourth Dist., Div. Two), in which we affirmed defendant's conviction and denied a petition for habeas corpus.

---

[1] Unless otherwise specified, all statutory references are to the Penal Code.

2

"Craig, who had previously been convicted of, inter alia, murder, attempted murder and threatening the President of the United States, was convicted in September 1995 of misdemeanor assault and a misdemeanor drug offense, for which he received probation. The public defender who represented Craig during the latter case (hereafter, the victim) felt that the disposition in that case was 'more than fair.' Craig did not agree. In February 1996, Craig sent the following letter to the deputy district attorney who was in charge of the prosecutor's office of the trial court where the disposition had been reached:

'Dear Sir,

'I don't know your name but, if you have some disagreement with this, you can take it up with the federal government.

'My name is Steven Eric Craig and I want to be legal and I do mean downright actual.

'I was arrested unlawfully by Hemet Police Dept. on 7–11–95, for which I received 3 yrs. probation from as a result of a crooked deal hammered out by [my p]ublic [d]efender . . . on 8–30–95.

'The Secret Service tells me you are the man to go to and who must overturn the conviction and let me be actual as a result of this so-called deal.

'[My p]ublic [d]efender told me that I couldn't be legal at my charges and also told me that Sheriff's Officers would be marching in, in a number of minutes to arrest me and to quote him "haul me off for 18 mos." So, I took the deal out of fear.

3

'I do not like to be told that I am not legal when I am.  He has obviously never been shot as a professional, yet.  His day is coming if he will not defend me to my satisfaction!  I mean business, sir!  I suggest you get some-thing done about this before I decide to show you just how legal I really am!  Make an app[oin]t[ment] . . . if you need anything explained any further!

'Thank You.

'Steven Eric Craig . . . .

'P.S.  [T]his is no threat, this is a promise!'  (Strikethrough in original.)

"The victim, who was shown the letter by the deputy district attorney who received it, testified that after he discovered information about Craig's past criminal convictions, which indicated that Craig was far more dangerous than he had originally thought, he took the statements in the letter as a threat.  He also said that his fear of Craig was greater at the time of trial than it had been when he was first shown the letter by the deputy district attorney."  (*Craig*, *supra*, 65 Cal.App.4th at pp. 1085-1086.)

"At trial [in the underlying prosecution], the parties stipulated that, following his arrest, Craig was given his *Miranda* [2] rights and he waived them and agreed to talk.  The sergeant who interviewed Craig testified that Craig admitted authoring the letter, saying it was directed at the victim.  When asked what he meant in the letter by the word, 'shot,' Craig put his hand in the form of a gun, which he pointed at the sergeant's chest,

---

[2]  "*Miranda v. Arizona* (1966) 384 U.S. 436."

and said, 'Bang,' five times.  Craig also said that he had a constitutional right to shoot the victim."  (*Craig*, *supra*, 65 Cal.App.4th at p. 1094.)

In addition to these facts culled from our prior opinion, we note the following:[3] Defendant had no weapons or ammunition in his possession at the time of arrest, and he told the arresting officers that he did not intend the letter to be threatening and never would have actually shot the victim.  Still, he explained to one of the officers who interviewed him after his arrest that he had a constitutional right to shoot his lawyer if "he's not being defended the way he likes."  Defendant appears to have felt he had a similar type of sovereignty over his houseguests; the victim's "understanding" was that defendant had shot two men, killing one and wounding the other, "because these two individuals would not leave his house when he wanted to go to bed."  Finally, the victim indicated he knew that defendant's threat against the life of the President to the United States was serious enough that it caused defendant to be placed in federal custody.

Defendant submitted his request for recall and resentencing while representing himself.  He asserted that the victim had "intimidated [him] into taking a plea bargain on a petty charge, abbreviating [his] rights."  In defendant's estimation, he "got screwed pretty bad for such a petty charge that it may as well have been jaywalking."

---

[3] The People attached a copy of the transcript from the preliminary hearing in the prosecution for violation of section 76 to a written supplemental opposition they filed to defendant's recall and resentencing petition.  The trial court explicitly stated that it had read the parties' briefs and supplemental briefs regarding resentencing, so we presume the court considered the transcript, as well.  We therefore derive the remainder of our factual summary from this portion of the record on this appeal.

The trial court denied defendant's petition on the ground that he was ineligible for resentencing. More specifically, it found that defendant intended to cause great bodily injury when he made the threat against his public defender. (§§ 667, subd. (e)(2)(C)(iii), 1170.12, subd. (c)(2)(C)(iii).) It based its conclusion on defendant's belief that he had a right to kill his houseguests, that he had actually killed one such individual, and that he had graphically described shooting his attorney in the chest.

ANALYSIS

Defendant appeals the trial court's determination that he was ineligible for resentencing. This determination was based on the finding that he had intended to cause great bodily injury to his public defender during the commission of his third strike crime. (§ 667, subd. (e)(2)(C)(iii).) The crime was threatening a public defender (former § 76), which he committed by mailing a threatening letter. Specifically, defendant in effect contends that he could not have intended to cause great bodily injury during the mailing of the letter because there was no evidence that the letter itself caused any injury.

As the Reform Act applies here, if defendant's current commitment offense is not a serious or violent felony, then defendant can be resentenced as a second strike offender unless the prosecution pleaded and proved that "[d]uring the commission of the current offense, the defendant . . . intended to cause great bodily injury to another person." (§ 667, subd. (e)(2)(C)(iii); see *People v. Yearwood* (2013) 213 Cal.App.4th 161, 167-168 (*Yearwood*).) "[W]e review the factual basis of the trial court's finding [that defendant harbored an intent to cause great bodily injury] under the familiar sufficiency

6

of the evidence standard." (*People v. Guilford* (2014) 228 Cal.App.4th 651, 661.) In so doing, we are mindful that the phrase "[d]uring the commission of" denotes a "temporal nexus," not a "facilitative nexus." (*People v. Osuna* (2014) 225 Cal.App.4th 1020, 1031-1033 (*Osuna*).)

In this case, defendant had already shot two men because he was dissatisfied with their continued presence in his house when he sent a letter complaining that his public defender should be "shot." When asked what he meant in the letter by "shot," defendant placed his finger and thumb in the shape of a gun and said "five times bang, bang, bang, bang, bang five times right in the chest." This definition envisions both a number of shots and an area of the body designed to cause serious harm. In fact, defendant told law enforcement that he had a right "guaranteed him by the constitution" to shoot an ill-performing attorney and, even the victim, who had acted as defense counsel on defendant's behalf, acknowledged that defendant believed he had a right to take similar actions against people who made him unhappy in his home. Moreover, defendant stated that "[he] mean[t] business, sir!," and he ended his letter with an indication that the shooting it described was "a promise." Substantial evidence supports the trial court's finding that defendant in fact harbored an intention to cause great bodily injury at the time of his mailing the threatening letter.

Defendant offers two reasons why the finding that he had some level of intent to cause great bodily harm to his public defender at the time of his mailing the letter, which led to his conviction under section 76, should not have disqualified him from

resentencing. First, he asserts that the great bodily injury exception uses a technical legal definition of the term "intent," such that "when the statute says the intent must occur 'during the commission of the offense' it means the legal intent of inflicting great bodily injury must arise from the acts constituting the current offense." In the alternative, defendant argues that, "even if 'during the commission of the offense' is interpreted to mean contemporaneously as argued by respondent, any intent still must be coupled with some act committed in that time period." Because each of these contentions rests on the assumption that an intent to commit great bodily injury cannot be legally cognizable unless it is coupled with a specific physical act, we address them together and reject the notion that the act of mailing a letter could never coexist with an intent to cause great bodily injury in a way that is relevant to resentencing.

Our analysis of defendant's most specific contentions on appeal requires us to interpret section 667, subdivision (e)(2)(C)(iii), which excludes defendant from resentencing if "[d]uring the commission of the current offense [he] intended to cause great bodily injury to another person." (§ 667, subd. (e)(2)(C)(iii).) "In construing [a statutory] scheme, 'We begin with the fundamental rule that our primary task is to determine the lawmakers' intent. [Citation.] In the case of a constitutional provision adopted by the voters, their intent governs. [Citations.] To determine intent, " 'The court turns first to the words themselves for the answer.' " [Citation.] "If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia

of the intent of the Legislature (in the case of a statute) or of the voters (in the case of a provision adopted by the voters)." ' " (*People v. Jones* (1993) 5 Cal.4th 1142, 1146.)

Defendant's arguments about the meaning of this language depend on the correctness of his initial premise, which is that "intent" in the relevant statutes must mean specific intent, or "an intent to accomplish some additional consequence by commission of the proscribed act," rather than general intent, which is simply the intent to engage in actions that constitute a crime. (*People v. Lyons* (1991) 235 Cal.App.3d 1456, 1458.) Unfortunately for defendant, he has not proved this to be the case, because he has not shown that intent must be coupled to the acts that make up the third strike conviction in the specific context of resentencing.

The reasoning of *Osuna* seriously undermines defendant's contention that any intent he may have had while sending the letter is irrelevant to the great bodily injury exception unless the letter was a step toward carrying out that intent. In *Osuna*, the prisoner seeking resentencing was serving a three strikes sentence after having been convicted of being a felon in possession of a firearm, but the People did not allege he was armed with a firearm at the time or allege a sentence enhancement based on being armed with a firearm.[4] (*Osuna*, *supra*, 225 Cal.App.4th 1020, 1027.) The trial court denied the prisoner's petition for resentencing, concluding he was ineligible because he was armed with a firearm during the commission of his offense. (*Id.* at p. 1028.) The appellate court

_____

[4] As the *Osuna* court noted, "possessing a firearm does not necessarily constitute being armed with a firearm." (225 Cal.App.4th at p. 1030.)

9

concluded the record contained evidence that the prisoner "had a firearm available for offensive or defensive use" during the commission of his offense because he "was actually holding a handgun." (*Id*. at p. 1030.) "Thus, factually he was 'armed with a firearm' within the meaning of the Act." (*Ibid*.)

The prisoner argued he was not ineligible for resentencing under section 1170.126, subdivision (e)(2), because a finding of being armed with a firearm had to be tethered to an underlying conviction or, phrased differently, there had to be a " 'facilitative nexus' " between the arming and the possession. (*Osuna*, *supra*, 225 Cal.App.4th at p. 1030.) The appellate court agreed that tethering and a facilitative nexus are required when imposing an "'armed with a firearm'" sentence enhancement under section 12022. (*Osuna*, at pp. 1030-1031.) The court then wrote: "However, unlike section 12022, which requires that a defendant be armed '*in* the commission of' a felony for additional punishment to be imposed (italics added), the Act disqualifies an inmate from eligibility for lesser punishment if he or she was armed with a firearm '*during* the commission of' the current offense (italics added). 'During' is variously defined as 'throughout the continuance or course of' or 'at some point in the course of.' [Citation.] In other words, it requires a temporal nexus between the arming and the underlying felony, not a facilitative one. The two are not the same. [Citation.]" (*Id*. at p. 1032.) Ultimately, the *Osuna* court concluded that, "[s]ince the Act uses the phrase '[d]uring the commission of the current offense,' and not 'in the commission of the current offense' (§§ 667, subd. (e)(2)(C)(iii), 1170.12, subd. (c)(2)(C)(iii)), and since at issue is not the imposition

10

of additional punishment but rather eligibility for reduced punishment . . . the literal language of the Act disqualifies an inmate from resentencing if he or she was armed with a firearm during the unlawful possession of that firearm." (*Ibid.*)

In other words, the *Osuna* court explicitly rejected the approach defendant urges us to adopt, because it held that a defendant may be found ineligible for resentencing on the ground that he was armed with a firearm even if his being armed did not further the crime that led to a third strike conviction. Even though the prisoner's "having the firearm available for use did not further his illegal possession of it," the fact that a firearm was available for use was sufficient to render the defendant ineligible for resentencing under the provision of section 667, subdivision (e)(2)(C)(iii), that pertains to ineligibility of defendants who were "armed with a firearm" " '[d]uring the commission of the current offense.' " (*Osuna*, *supra*, 225 Cal.App.4th at p. 1032.) We see no reason why the same reasoning should not apply to the great bodily injury exception.

Defendant asserts *Osuna* is inapplicable because that court considered the exception related to being armed with a firearm, which is a status that can exist even without a link to a crime, while the legal definition of "intent" intrinsically requires a facilitative nexus to a third strike offense. At this point, defendant's argument becomes circular; he essentially asks us to conclude that intent "has no independent existence separate from an act made to accomplish the intended result" simply because he insists that intent can never have such an independent existence. Because he cannot establish his initial premise, his argument is a nonstarter.

11

To prove that intent must always be tethered to a physical act, defendant cites to section 7, which reads: "Words and phrases must be construed according to the context and the approved usage of the language; but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in law, must be construed according to such peculiar and appropriate meaning." (§ 7, subd. 16.) This argument begs the question. In order for defendant to be correct that "intent" has a "technical" meaning of "specific intent," he must show that "intent" has "a peculiar and appropriate meaning" in law. As we have explained, he failed to make this showing.

Defendant also cites section 20 in support of his theory that intent cannot exist in a vacuum, even at resentencing. That statute reads: "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." However, eligibility for resentencing is neither a "crime" nor a "public offense." Section 20 therefore does not apply.

Similarly, defendant relies on cases that discuss "specific intent" in the context of defining the elements of crimes. Without some showing that the same framework applies in the context of resentencing, these authorities are as inapposite as section 20. (See *Osuna*, *supra*, 225 Cal.App.4th at pp. 1030-1031 [facilitative nexus required before a court may impose a sentencing enhancement based on the defendant's being armed with a firearm, but only a temporal nexus is required between the defendant's being armed and the acts constituting the offense if the issue is whether the defendant is eligible for resentencing].)

12

For these reasons, and with the help of *Osuna*, we find the great bodily injury exception in section 667, subdivision (e)(2)(C)(iii), to be clear enough that we could decide this appeal with no need to rely on extrinsic evidence of the voters' intent in adopting the Reform Act. If an ambiguity does exist, the conclusion we draw regarding the interpretation of the great bodily injury exception to eligibility for resentencing also meshes with the purpose behind the Reform Act, at least as it has been articulated by earlier opinions.[5]

The *Yearwood* court described the purpose of the Reform Act as follows: "The Act's proponents advanced six arguments in favor of the Act in the Voter Information Guide. The argument headings were titled: (1) 'make the punishment fit the crime'; (2) 'save California over $100 million every year'; (3) 'make room in prison for dangerous felons'; (4) 'law enforcement support'; (5) 'taxpayer support'; and (6) 'tough and smart on crime.' (Voter Information Guide, Gen. Elec. (Nov. 6, 2012) argument in favor of Prop. 36, p. 52, capitalization omitted.) The ballot arguments supporting Proposition 36 were primarily focused on increasing public safety and saving money. The public safety

_____

[5] In search of evidence about what the voters intended, defendant in this case asks us to view the Voter Information Guide for the Reform Act by visiting links to websites he provided in footnotes in his reply brief. We decline the invitation. Setting aside defendant's failure to file a motion asking us to take judicial notice that addressed all of the factors set forth in California Rules of Court, rule 8.252(a), we need not resort to extrinsic evidence because some of the cases on which we quote make use of the Voter Information Guide. Instead of following links to which the People could not respond because defendant did not provide them until the reply, we use reported decisions as a source of information about the voters' intent in enacting the Reform Act.

argument reasoned, 'Today, dangerous criminals are being released early from prison because jails are overcrowded with nonviolent offenders who pose no risk to the public. Prop. 36 prevents dangerous criminals from being released early. People convicted of shoplifting a pair of socks, stealing bread or baby formula don't deserve life sentences.' (Voter Information Guide, Gen. Elec., *supra,* rebuttal to argument against Prop. 36, p. 53.) Also, 'Prop. 36 will help stop clogging overcrowded prisons with non-violent offenders, so we have room to keep violent felons off the streets' and 'Prop. 36 will keep dangerous criminals off the streets.' (Voter Information Guide, Gen. Elec., *supra,* argument in favor of Prop. 36, p. 52.) The Act's proponents stated that 'Criminal justice experts and law enforcement leaders carefully crafted Prop. 36 so that truly dangerous criminals will receive no benefits whatsoever from the reform.' (*Ibid.*) The fiscal argument reasoned that the Act could save taxpayers '$100 million every year' that would otherwise be spent 'to house and pay health care costs for non-violent Three Strikes inmates if the law is not changed.' (*Ibid.*)" (*Yearwood*, *supra*, 213 Cal.App.4th at p. 171.)

Defendant chooses selectively from the Voter Information Guide that accompanied the initiative that became the Reform Act, and he discusses only those portions of the document that indicate an intention to decrease the prison population and ensure the release of minor offenders. What defendant ignores is that the voters balanced these goals against a desire to promote safety and keep dangerous felons off the streets. Interpreting the great bodily injury exception to require a temporal but not a facilitative

14

nexus between the defendant's intent and the crime committed furthers this purpose by making it harder for prisoners who intended to cause great bodily harm to others to achieve release.

We also note that the statutory construction we propose is consistent with the purpose behind section 12022.7's enhancement for defendants who " 'personally inflict[] great bodily injury on any person other than an accomplice,' " which is to punish more culpable offenders more severely. (See, e.g., *People v. Weaver* (2007) 149 Cal.App.4th 1301, 1325-1326.) We are not unaware that the section 12022.7 enhancement requires proof that the defendant actually caused great bodily injury, while the great bodily injury exception to eligibility for resentencing only requires proof of an intent to cause such damage. However, defendant has cited, and we have found, no authority prohibiting the voters from structuring the resentencing portion of the Reform Act around the principle that a known felon who nonetheless harbors the intention to cause great bodily injury during the commission of yet another felony is more culpable and thus less suitable for release than someone who committed the same acts but without the intent to cause great bodily injury.

Finally, and to illustrate his claim that requiring only a temporal nexus between intent and offense would lead to absurdity, defendant proffers a hypothetical in which a person commits a felony by forging a check and says to a bank teller in the process that he plans to severely beat his wife later that evening. According to defendant, no reasonable jurist could agree that a defendant fitting this factual scenario should be

15

deemed ineligible for resentencing simply because he intended to cause great bodily harm during the commission of the offense.  Our short answer is that the facts actually before us raise no such issues.  Here, the trial court found that defendant intended to commit great bodily harm against his public defender when sending a threatening letter to that public defender.  Unlike defendant's forgery example, defendant's intention to commit great bodily harm and the letter that violated section 76 occurred at the same time and were directed at the same victim.  Moreover, by writing down the threat and sending it to the district attorney, which is in itself a physical act, defendant could be seen to have taken a step toward carrying out a plan to actually commit the shooting he said he wanted to inflict on the victim.  Defendant's hypothetical is so factually inapposite that it gives us no pause before affirming the trial court's determination that defendant was ineligible for resentencing.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ_____<br>P. J.

We concur:

HOLLENHORST_____
J.

McKINSTER_____
J.

16